# EXHIBIT 1

**TO THE BADWAY REPLY DECLARATION**

**Rosales, Daniel M.**

| | |
|---|---|
| **From:** | Scott P. Shaw <sshaw@merchantgould.com> |
| **Sent:** | Friday, January 8, 2021 4:47 PM |
| **To:** | Badway, Ernest E.; Leier, Ranelle |
| **Cc:** | Scott, Melissa E.; Rosales, Daniel M.; Zach Kachmer |
| **Subject:** | [EXT] RE: Defendants' MSJ - request to meet and confer |

Ernest –

I am following up again on my request that Plaintiff provide an explanation for its extremely late "supplemental" production of documents, which seemingly could and should have been produced a very long time ago in response to document requests or as part of Plaintiff's Rule 26 disclosures during the discovery period.  As you will recall, I e-mailed you on December 17th and requested that you provide me with any justification for the late production ASAP.  I have followed up numerous times but have not received any response from you.  If you prefer not to provide a response, I will assume there was zero justification for the late production.  As you know, we have testimony from Plaintiff that it failed to preserve documents and we have representations from Plaintiff's counsel that its document production was completed during the discovery period.  So, the late production of relevant documents after the discovery period is not only harmful and prejudicial to Defendants (i.e., the documents were available to question Plaintiff's witnesses or available for Defendants' expert to review), it is grounds for sanctions under FRCP 37.  If you agree to withdraw all the untimely documents and not seek to introduce them in this case, then it will become moot.  If you intend to rely on them, particularly in connection with the parties' cross-motions for summary judgment, then we will also need to confer on Monday regarding our Rule 37 motion for sanctions.

I will now address the specific issues you raised in your email.

First, Liaigre's Interrogatory No. 6 only requested information about sales of the allegedly infringing furniture "since and including 2012 through the present." Those interrogatories were served on May 7, 2020. California Furniture produced documents pursuant to Rule 33(d) showing sales through June 2020.

Second, RFPs Nos. 9-16 regarding the sales of the allegedly infringing furniture do not refer to any time period. Yet section D of the Instructions to Liaigre's RFPs states that "[i]f a document request is silent as to the time period for which production of documents or other things is sought, YOU shall produce all documents . . . at any time through the date of YOUR production."

Third, as you know, California Furniture did not have the emails with Lori Gentile. They were deleted in the ordinary course of business before the initiation of this lawsuit, and you had them prior to her deposition and prior to California Furniture's deposition.

Fourth, the documents showing furniture similar to Liaigre's furniture were relief upon by Defendants' expert, Lance Rake.  At California Furniture's Rule 30(b)(6) deposition, Mr. Vogt testified that he had not seen those documents and was not aware of them, thus they were not in Defendants' possession. Defendants' expert is entitled to rely on any documents, whether they were produced or not.  In fact, many of those documents were attached as exhibits to Rake's expert report.

Thank you.  I look forward to our call on Monday.

Scott

**From:** Scott P. Shaw
**Sent:** Tuesday, January 5, 2021 1:31 PM
**To:** L. Lisa Sandoval <lsandoval@calljensen.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>
**Subject:** RE: Defendants' MSJ - request to meet and confer

Thanks Lisa.

Ernest – I will respond more fully tomorrow or Thursday, but I would still like to know why these documents were not produced pursuant to FRCP 26 or in response to discovery requests.  My emails have asked you to simply explain the justification for the late production after discovery has closed, and that has caused prejudice to my clients and prevented our experts from reviewing the documents.  Please provide me with a response stating why you believe Plaintiff is substantially justified in supplementing its document production after the close of discovery.  Thank you.

**From:** L. Lisa Sandoval <lsandoval@calljensen.com>
**Sent:** Tuesday, January 5, 2021 1:23 PM
**To:** Badway, Ernest E. <EBadway@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>; Scott P. Shaw <sshaw@merchantgould.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>
**Subject:** RE: Defendants' MSJ - request to meet and confer

CAUTION - External.

Counsel,

Would you please send emails to Scott Shaw at his new email address, sshaw@merchantgould.com, copied here?

Thanks,
Lisa



L. LISA SANDOVAL
ASSOCIATE

TELEPHONE 949.717.3000
FACSIMILE 949.717.3100

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Badway, Ernest E. <EBadway@foxrothschild.com>
**Sent:** Tuesday, January 5, 2021 9:46 AM
**To:** Leier, Ranelle <rleier@foxrothschild.com>; Scott Shaw <sshaw@calljensen.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** RE: Defendants' MSJ - request to meet and confer

We are a little surprised by your response given that the parties in this action have a continuous obligation to update discovery responses and their document productions pursuant to the

Federal Rules of Civil Procedure.  Further, you continue to misrepresent and take out of context previous statements that were made, and ignore the fact we have consistently and repeatedly stated without equivocation that all of the parties in this action have a continuing duty to supplement their productions if documents are discovered.  In fact, the recently produced documents were all referenced at the Liaigre FRCP 30(b)(6) deposition, and the witnesses were questioned about them.

Nonetheless, we note that Defendants' are substantially delinquent and incomplete in their document production, and, as such, demand an explanation for Defendants' failures in their production.  Initially, ironically, you seem to be complaining about the documents our client produced, yet your clients produced **700 pages after individual fact witness depositions were complete**.  Further, at the CFC deposition, it became clear that your office had unilaterally prepared these documents months before producing them, but CFC had no idea where they came from, when or how they were obtained, and when or if any of the supposed third party products were offered for sale in the US.  We find it hard to believe any of these documents are admissible under the Federal Rules of Evidence.

Additionally, CFC has not updated its 2020 sales of the CFC furniture at issue since May 2020.  These sales figures must be updated to reflect, at minimum, sales from May-November 2020.  These are relevant to Liaigre's claims, as set forth in the report of Bryce Cook.  This is a basic discovery obligation that your client must meet.

Moreover, documents responsive to Liaigre's initial set of RFPs were due ***December 2019***, but your clients unilaterally designated certain documents Highly Confidential/Attorneys' Eyes Only, in violation of the initial protective order.  You demanded that Liaigre accede to these demands, and Liaigre did, but your clients have still failed to produce these documents.  It has now been over a year since these documents were supposed to be produced yet they remain outstanding.  Kindly explain the utter failure to produce these documents.

Finally, we are also aware that your client has not produced other key documents in this matter.  We received emails from a third party that your client sent to and received from a third party, but were not produced by your clients.  These documents were discussed at the deposition of Lori Gentile, and revealed a systematic effort to coach a witnesses' testimony.  As such, there are obviously documents in your clients' possession, but have not been produced.  Please explain your clients' failure to produce these documents as well.

We await your response.

**Ernest E. Badway**
Fox Rothschild LLP
212-878-7986 (NY)
973-994-7530 (NJ)
201-724-0665 (Cellphone)
Twitter: @ebadway

Blog: http://securitiescompliancesentinel.foxrothschild.com/

---

**From:** Scott P. Shaw <sshaw@merchantgould.com>
**Sent:** Monday, January 04, 2021 8:10 PM
**To:** Leier, Ranelle <rleier@foxrothschild.com>; Scott Shaw <sshaw@calljensen.com>; Badway, Ernest E. <EBadway@foxrothschild.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** [EXT] RE: Defendants' MSJ - request to meet and confer

I am still working on transitioning to my new firm, still need to file the Substitution forms, and noticed that Plaintiff supplemented with another 99 pages (which I will not have time to review by the 7th).  I am also confused why Plaintiff continues to produce documents after the discovery deadline, especially given prior representations that all documents had been produced months ago.  I have asked for explanations from you several times and noted the prejudice to Defendants, yet I have not received a response from you.  Can you please explain?

---

**From:** Leier, Ranelle <rleier@foxrothschild.com>
**Sent:** Monday, January 4, 2021 4:56 PM
**To:** Scott Shaw <sshaw@calljensen.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Scott P. Shaw <sshaw@merchantgould.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** RE: Defendants' MSJ - request to meet and confer

**CAUTION - External.**

---

Scott:

We are available on January 7 to confer regarding the parties' motions for summary judgment.  Please suggest some times when you are available.

Ranelle

**Ranelle Leier**
Partner
**Fox Rothschild LLP**
(612) 607-7247 direct
(612) 720-8951 cell
rleier@foxrothschild.com

---

**From:** Scott Shaw <sshaw@calljensen.com>
**Sent:** Wednesday, December 30, 2020 2:11 PM
**To:** Badway, Ernest E. <EBadway@foxrothschild.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>; L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** [EXT] RE: Defendants' MSJ - request to meet and confer

Counsel –

I have not received a response to my request to meet and confer that I sent on December 21st.

Also, I am writing to advise you that my last day at Call & Jensen is December 31st. I am joining Merchant & Gould on January 4th and spearheading a Los Angeles office. I will provide you my new e-mail address on January 4th and will file Substitution of Attorneys forms for the Defendants.

I suggest that we confer on January 6th or 7th.

Have a Happy New Year.

Thank you.

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** Scott Shaw
**Sent:** Thursday, December 24, 2020 8:31 AM
**To:** Badway, Ernest E. <EBadway@foxrothschild.com>
**Cc:** Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>; L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** Re: Defendants' MSJ - request to meet and confer

Let's confer on the 29th or 30th

Sent from my iPhone

On Dec 24, 2020, at 10:18 AM, Badway, Ernest E. <EBadway@foxrothschild.com> wrote:

Counsel:

We write in response to your email regarding Defendants' request to meet and confer regarding their proposed Motion for Summary Judgment, as well as our request to meet and confer pursuant to Local Rule 7-3 on plaintiff Liaigre's Motion for Summary Judgment. Liaigre intends to move for summary judgment on all of its claims in its Complaint as well as on Defendants' counterclaims, and plans to discuss both of the parties' summary judgment motion at one meet and confer. Regarding Plaintiff's Motion for Summary Judgment, Liaigre intends to move for summary judgment on the grounds set forth below, and, as such, for these same reasons, Defendants' proposed summary judgment motion is baseless and not

supported by either the facts or the law.  In short, there is simply no material fact in dispute or legal principle that would preclude Liaigre's summary judgment motion.

## Copyright Infringement

The parties agree that each of the 9 pieces of Liaigre furniture were created in France, thus, French law applies.  French law regularly grants copyright protection to unique designs of furniture, and the Liaigre furniture is classified as a collective work.  This characterization is clearly demonstrated by Mr. Christian Liaigre's employment contract.

Further, the character of collective work in all designs created by Liaigre SAS under the direction of Mr. Liaigre was confirmed by Mr. Christophe Caillaud and Ms. Frauke Meyer during their depositions.  Defendants presented no evidence to dispute this uncontroverted fact.

Additionally, all employment and independent contractor agreements between the individuals and Liaigre SAS contain identical provisions granting the rights in all collective works to Liaigre SAS.  Liaigre SAS granted plaintiff Liaigre, Inc., the exclusive right to enforce economic/patrimonial copyrights in the Liaigre Furniture in the United States.

Moreover, as explained in detail in the expert report of Charles Mauro, the infringing CFC furniture products are substantially similar to the designs of the corresponding Liaigre Furniture.

Accordingly, Liaigre is entitled to summary judgment on its copyright claims.

## Trade Dress Infringement

Liaigre is also entitled to summary judgment on its trade dress claims.

Initially, as recognized by the United States Court of Appeals for the Ninth Circuit in *Blumenthal Distrib. Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 867 (2000), the utilitarian functionality of a piece of furniture's "various features does not make [that piece of furniture's] overall appearances functional as a matter of law."  Judge Kronstadt has noted that "[t]he fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of trade dress. [] [T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive."  *Blumenthal Distrib. Inc. v. Herman Miller, Inc.*, 2016 US. Dist. LEXIS 106449, at *23-24 (C.D. Cal. Mar. 31, 2016) (citations omitted).

Here, there is substantial evidence that the overall appearance of each piece of the Liaigre Furniture was the result of non-utilitarian design choices. The Liaigre Furniture easily meets the standard for non-functional trade dress.

Additionally, proof of copying is sufficient to establish secondary meaning. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (citing *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985) ("Moreover, we have held that proof of copying strongly supports an inference of secondary meaning."); *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)). Further, "[a] showing that defendant intended to copy plaintiff's trade dress is entitled to substantial weight in the likelihood of confusion determination." *Vision Sports¸* 888 F.2d at 616 (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 845-46 (9th Cir. 1987).

The uncontroverted testimony of CFC's President Erik Vogt establishes that CFC willfully copied Liaigre's designs. CFC produced photographs of two pieces of Liaigre's furniture that CFC used to design and create the infringing furniture. The undisputed evidence also establishes that CFC coordinated with at least one interior designer to deliberately create direct copies of at least three pieces of Liaigre's furniture. In Lori Gentile's own words to Erik Vogt when discussing Liaigre, she admitted "they know I had a few copied right?" CFC has also admitted that it destroys documents as it designs furniture, essentially, eliminating any further paper trail of its violations.

The overwhelming evidence establishes that Defendants had access to Liaigre's designs, and, with that access, Defendants created a complete line of identical, strikingly similar, or substantially similar furniture, with the intent to trade off of Liaigre's established reputation in the furniture design and sale business.

## **Statutory Unfair Competition, and Common Law Trade Dress Infringement and Unfair Competition Claims**

For same reasons that Plaintiff Liaigre is entitled to summary judgment on its copyright infringement and trade dress infringement claims, Liaigre is also entitled to summary judgment on Counts III and IV of its Complaint.

## **Punitive Damages**

The same facts supporting a willfulness finding regarding Defendants' conduct. The evidence clearly establishes, among other things, that Defendants acted with the necessary fraudulent intent and/or maliciousness to support an award of punitive damages.

As opined by Liaigre's expert Charles Mauro, this is a highly unusual and egregious form of blatant copying by CFC and the most aggressive and extensive copying he has witnessed in his 50 years of practice. This strongly suggests that CFC has undertaken a well thought out, and carefully executed effort of intentional copying regarding the many of the Liaigre furniture designs at the heart of this legal matter. Moreover, it is clear from the uncontroverted testimony in this case that interior designers will no longer work with Defendant CFC because of its conduct, clear evidence that Defendants have acted with fraudulent intent and/or maliciousness. Defendant CFC employs only one "designer," an individual without any formal design training or experience. Defendant CFC is a business dependent upon a business model of unfair competition; rather than hire designers to create original and unique designs, Defendant CFC instead directly copies successful designs of others, including Liaigre. Thus, an award of punitive damages is obviously appropriate.

**<u>Treble Damages or Profits</u>**

As indicated in Liaigre's complaint, this is an exceptional case pursuant to 15 U.S.C. § 1117(b) for all of the reasons stated above. Accordingly, there is no doubt that the Court should declare this an exceptional case justifying an award of attorney's fees under 15 U.S.C. § 1117(b).

Finally, regarding your requests to have a court reporter present and to have the call recorded by Zoom, we object to both requests. Such recordings are not customary and not necessary. Moreover, the requirements, pursuant to the Local Rule and the FRCP, only call upon the parties to discuss and attempt to resolve their differences over said motions. Under Local Rule 7-3, the only statement to the Court that is required regarding the meet and confer is one to the effect that: "This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on (date)." The Local Rule does not require a recitation of the meeting or a summary of what occurred. Further, neither the Local Rule nor the FRCP pre-supposes the "meet and confer" is to be used as a discovery tool that you seek to imply with the proposed use of a court reporter and a recording. Instead, it is clear that the "meet and confer" is more akin to settlement discussions covered by Federal Rule of Evidence 408. As such, our discussions relating to both our proposed summary judgment against your clients as well as your clients' potential summary judgment motion against our client will be privileged and not subject to any recording. Accordingly, we will not agree to any recording whatsoever and propose a simple telephone conference. At your convenience since we are not going to be around for the rest of the day and the weekend, please provide us with dates and times when you are available for a call to meet and confer regarding the motions for summary judgment.

**Ernest E. Badway**

Fox Rothschild LLP
212-878-7986 (NY)
973-994-7530 (NJ)
201-724-0665 (Cellphone)
Twitter: @ebadway
Blog: http://securitiescompliancesentinel.foxrothschild.com/

---

**From:** Scott Shaw <sshaw@calljensen.com>
**Sent:** Monday, December 21, 2020 3:46 PM
**To:** Badway, Ernest E. <EBadway@foxrothschild.com>; Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>
**Cc:** L. Lisa Sandoval <lsandoval@calljensen.com>
**Subject:** [EXT] Defendants' MSJ - request to meet and confer

Counsel,

We write to meet and confer pursuant to Local Rule 7-3 regarding Defendants California Furniture's and Gina B's anticipated Motion for Summary Judgment. Defendants are entitled to judgment on all four causes of action, and judgment that Liaigre is not entitled to punitive damages, treble damages or profits. Please review below and let me know a date you are available to meet and confer.  Once we set a date, we can schedule a Zoom call with a court reporter so we have a record for the Court.  Thank you.

**Defendants Are Entitled to Summary Judgment on Plaintiff's Copyright Infringement Claim**

 First, there is no genuine issue of material fact that Liaigre France does not own valid copyrights to any of the 8 pieces of furniture, and accordingly, Liaigre US lacks a valid copyright to sue for copyright infringement. Pursuant to art. 2 § 6 of the Berne Convention, works created in France "enjoy protection" in the United States since both countries are party to the treaty. When a plaintiff alleges copyright infringement of a foreign work in the United States, "[i]nitial ownership of a copyrighted work is determined by the laws in the work's country of origin." *Lahiri v. Universal Music & Video Distrib., Inc.*, 513 F.Supp.2d 1172, 1176 n.4 (C.D. Cal. 2007). Since each of the 8 pieces of Liaigre furniture were created in France, French law applies. Yet as Defendants' distinguished French law expert Professor Binctin explains,  Liaigre France is not the owner of the purported copyrights under French law for the following reasons.

> (i)       Christian Liaigre's employment contract, the only agreement produced by Liaigre with a person who actually participated in the creation of the furniture, does not transfer the intellectual property rights of any of the furniture.

> (ii)      There is no agreement in which Christian Liaigre contributed in kind any of the works to Liaigre France.

> (iii)     Liaigre failed to present any admissible evidence that the 8 works were created as collective works, specifically, of the creative process specific to each piece of furniture, relating to the initiative of the project, the direction of the project, the identification of the members of the project team, and the final selection of the project by the management.

(iv)      Liaigre failed to produce any assignments of the 8 pieces of furniture to Liaigre France. Although there was testimony about a purported agreement from Eric Schmitt transferring certain intellectual property rights to Liaigre France, the agreement was never produced, and Mr. Schmitt retained certain intellectual property rights.

Since Liaigre US has failed to show that Liaigre France owns a valid copyright, any purported license to Liaigre US of the copyrights is void ab initio as a matter of law.

Second, there is no genuine issue of material fact that Liaigre US lacks standing to sue for copyright infringement as a non-exclusive licensee.  Under section 501(b) of the Copyright Act, only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). There is no standing where the purported license agreement lacks (i) a provision providing that the licensee had the power to authorize third parties to reproduce, distribute, or display the work; or (ii) "any limitation whatsoever on the [licensor's] authority to contract with" third parties. *DRK Photo v. McGraw-Hill Global Educ. Holdings, LLC*, 870 F.3d 978, 984 (9th Cir. 2017). "In the absence of any such promise, [the license agreement] confer[s] [a] nonexclusive license[ ] and do[es] not render [the licensee] a legal owner for standing purposes. *Id.* at 984-85. Defendants are entitled to summary judgment because Liaigre's purported license letter agreement on February 15, 2012 lacks any provision providing that Liaigre US has the power to authorize third parties to reproduce, distribute, or display the work. Moreover, Liaigre US did not authorize any third party to distribute the furniture. Instead, Liaigre only entered into agreements with third-party showrooms allowing them to represent Liaigre as sales representatives. There is no limitation on Liaigre France's authority to contract with other third parties. Indeed, Liaigre US's manufacturing agreement with Brusic-Rose Inc. acknowledges that "all intellectual property rights in and to" the design drawings of 8 pieces of furniture at issue in this action "shall at all times remain exclusively the property of Christian Liaigre SAS."

Third, there is no genuine issue of material fact that the 8 pieces of furniture are "useful articles," and therefore not entitled to copyright protection.  The U.S. Copyright Act is clear that a "useful article" is an article having an intrinsic function that is not merely to portray the appearance of the article or to convey information, and protection only exists to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article. See 17 U.S.C. § 101. There is no genuine dispute of material fact that the U.S. Copyright Office would not grant copyright protection for the 8 pieces of furniture. Indeed, the US Copyright Office has cited to "furniture" as a classic example of a "useful article" not subject to copyright protection.  See https://www.copyright.gov/comp3/chap900/chap900-draft-3-15-19.pdf .  Furthermore, the Supreme Court has emphasized that "a feature incorporated into the design of a useful article is eligible for copyright protection only if the feature (1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic, or sculptural work--either on its own or fixed in some other tangible medium of expression--if it were imagined separately from the useful article into which it is incorporated." *Star Athletica, L.L.C v. Varsity Brands, Inc.*, 137 S.Ct. 1002, 1007 (2017). Defendants are entitled to summary judgment because, as the undisputed facts demonstrate and as Defendants' expert Professor Lance Rake finds, none of the elements that Liaigre identified as subject to copyright protection at its Rule 30(b)(6) deposition can be perceived as a three-dimensional work separate from the furniture, and none of those elements would qualify as protectable work.

## Defendants Are Entitled for Summary Judgment on Plaintiff's Trade Dress Infringement Claim

First, there is no genuine dispute of material fact that Liaigre cannot show that the asserted product designs have acquired secondary meaning. "A product's trade dress attains secondary meaning when the purchasing public associates the [trade] dress with a single producer or source rather than just the

product itself." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (1987). As an initial matter, Liaigre admitted at is Rule 30(b)(6) deposition, and multiple individual depositions that a person would not be able to identify any of the 8 pieces of furniture as being made by Liaigre unless they were already familiar with that particular product. Liaigre has not presented any direct evidence of secondary meaning, such as customer surveys or testimony. The only circumstantial evidence is far from sufficient to raise a genuine issue of material fact. Its purported advertising and promotional expenditures do not feature any common elements of the Liaigre furniture indicating that prospective buyers would associate those elements with Liaigre. *See id.* ("[T]he advertising and promotional activities must involve 'image advertising,' that is, the ads must feature in some way the trade dress itself."). In addition, "[i]t is well-established that evidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning. *See Continental Laboratory Products, Inc. v. Medax Int'l, Inc.*, 114 F.Supp.2d 992, 1003 (S.D. Cal. 2000). Any sales occurring after California Furniture commenced selling the allegedly infringing furniture has "no legal relevance" to whether Liaigre's furniture acquired secondary meaning. *Id.* And there is no data placing Liaigre's raw sales figures into context of the market or identifying the number of distinct customers. *Id.*

Second, there is no genuine dispute of material fact that Liaigre's asserted protected elements in the furniture are functional. The plaintiff carries the burden to prove nonfunctionality of trade dress. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987). "[T]he Supreme Court split functionality into two types, each with its own legal test. . . . The two types are 'utilitarian functionality,' which is based on how well the product works, and 'aesthetic functionality,' which is based on how good the product looks. . . . A claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its costs or quality." *Blumenthal Distrib. Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 865 (2000). That is, "[a] claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality." *Id.* Court use the four-factor test from *Disc Golf Association, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002 (9th Cir. 1998) whether there is utilitarian functionality: "(1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.* Here, each of the asserted protected elements are functional under the *Disc Golf* test, as set forth more fully in Defendants' expert report. Protection of Liaigre's asserted trade dress would impose a significant non-reputation-related competitive disadvantage.

**Defendants Are Entitled for Summary Judgment on the Statutory Unfair Competition, and Common Law Trade Dress Infringement and Unfair Competition Claims**

For the same reasons that Defendants are entitled to summary judgment on the statutory copyright infringement and trade dress infringement claims, Defendants are also entitled to summary judgment on the third and fourth causes of action.  *See Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 875 (9th Cir. 2002) (plaintiff's unfair competition claim under state law "fails because its related Lanham Act claims fail.").

**Defendants Are Entitled to Judgment That Plaintiff Is Not Entitled to Punitive Damages**

There is no genuine dispute of material fact that Liaigre is not entitled to punitive damages under its common law trade dress infringement and unfair competition count because Defendants' acts were not oppressive, fraudulent, or malicious. There is no such evidence. And punitive damages are not available under the U.S. Copyright Act of 1976, the Lanham Act, or California Business and Professions Code § 17200.

**Defendants Are Entitled to Judgment that Plaintiff Is Not Entitled to Treble Damages or Profits**

There is no genuine issue of material fact that Defendants did not use a counterfeit mark, the only statutory basis for treble damages or profits. Accordingly, Liaigre is not entitled to treble damages or profits for its trade dress infringement claim. 15 U.S.C. § 1117(b).

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# EXHIBIT 2

**TO THE BADWAY REPLY DECLARATION**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA


| | | |
|---|---|---|
| LIAIGRE, INC, | ) | CASE NO: 8:19-CV-01160-JAK-KES |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| CALIFORNIA FURNITURE | ) | Friday, October 16, 2020 |
| COLLECTION, INC, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |


HEARING RE:

DEFENDANTS' NOTICE OF DISCOVERY MOTION
AND TELEPHONIC CONFERENCE [DE.NO.53]


BEFORE THE HONORABLE KAREN E. SCOTT,
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**

For Plaintiff:            ERNEST E. BADWAY, ESQ.
                          Fox Rothschild, LLP
                          101 Park Avenue, 17th Floor
                          New York, NY 10178


For Defendants:           LAURA L. SANDOVAL, ESQ.
                          Call & Jensen, APC
                          610 Newport Center Dr., Suite 700
                          Newport Beach, CA 92660


Court Reporter:           Recorded; AT&T

Courtroom Deputy:         Jazmin Dorado

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1              **Santa Ana, California; Friday, October 16, 2020**

2                            **Call to Order**

3                       **Zoom Web Conference**

4          **THE COURT:**  We're on the record on Case Number

5    SA CV-19-1160-JAK-KES, Liaigre, Incorporated versus California

6    Furniture Collections, Incorporated, et al.  Magistrate Judge

7    Karen E. Scott, presiding.

8               Counsel, please go ahead and state your appearances

9    for the record.

10         **MR. BADWAY:**  Yes, good morning, your Honor.  Sorry

11   for jumping the gun before we were on the record.  This is

12   Ernest Badway representing the Plaintiff.

13         **MS. SANDOVAL:**  Good morning, your Honor.  Lisa

14   Sandoval on behalf of Defendants California Furniture

15   Collection, Inc. and Robert James -- doing business as Robert

16   James Collection and Gina B and Company, Inc.

17         **THE COURT:**  Good morning, Counsel.

18              I have had an opportunity to look at the letter

19   briefs that were submitted, and it seems that there are three

20   issues to discuss.  Let's talk about each one of those in turn

21   and counsel can tell me if I have missed something or brought

22   something up that isn't fairly raised by the briefing.

23              The first dispute that I saw had to do with three

24   interrogatories that Plaintiff initially answered by referring

25   to documents and there was some subsequent efforts to meet and

3

1    confer to understand what specific documents answered the

2    interrogatory, and as a result of those meet and confer efforts

3    Plaintiff filed supplemental responses.  I understand that one

4    of the supplemental responses was not going to be served until

5    mid-October which was -- October 14th, about the same date that

6    the letter briefs were coming in, that was two days ago or so.

7              So I guess at this point I want to have an

8    understanding of whether there is still a issue about

9    interrogatories that were answered by reference to documents,

10   or whether the supplemental responses that either identified

11   documents by Bates number or affirmatively stated that upon

12   reconsideration they didn't see that there were any documents

13   that answered the interrogatory, if those supplemental

14   responses have resolved that dispute.

15             **MS. SANDOVAL:**  Good morning, your Honor, this is

16   Ms. Sandoval.

17             Plaintiff subsequently did serve supplemental

18   responses to Interrogatories 1, 5 and 6.  They -- from our

19   perspective those responses have resolved the issue, they

20   either identified the documents or provided the information.

21   My understanding is that the verifications will be a separate

22   topic and we can address that --

23             **THE COURT:**  Right.  Okay, so that, in fact, was my

24   topic number two, is I see that there have been supplemental

25   answers to interrogatories that have been provided and those

4

1   have not been accompanied by verification, although written

2   responses to interrogatories do need to be verified under the

3   rules.

4          So let me ask Mr. Badway, are those verifications

5   coming or what is the situation there?

6          MR. BADWAY:  Yes, your Honor, they are coming.  They

7   have to be notarized -- they have to be signed by someone in

8   France and they are on their way.  We thought it best that at

9   least before this Court conference so that we could represent

10  to the Court they have been supplemented after many emails back

11  and forth with Defendants' counsel about exactly what they were

12  looking for, and those interrogatories supplemental

13  certifications will be produced to Defendants' counsel.  I have

14  my fingers crossed, you can't see me, your Honor, I'm hoping by

15  this afternoon, but it could be Monday.

16         THE COURT:  Okay.  I assume that they're going to

17  sign them in France and scan them and email them so we're not

18  waiting for paper to come from France, right?

19         MR. BADWAY:  Yes.  Yes, that is absolutely positively

20  100 percent correct, your Honor, exactly, yeah.

21         THE COURT:  Okay.  So we'll table that and if for

22  some reason those verifications don't show up, then Defendants

23  can certainly re-raise that issue, but for now there's not a

24  dispute there that the verifications need to be provided and we

25  have Mr. Badway's representation that they are being provided.

1     **MR. BADWAY:** Your Honor, if I just may add, it's my

2  understanding by my reading of the federal rules, and I'm more

3  than happy for the Court to correct me, but every time you

4  supplement the interrogatories, you have to have new

5  certifications, you can't rely upon something that's old, so

6  that's why -- my understanding is that the certifications for

7  the other two supplemental -- or the original and the

8  supplementals, so this is now the third time as well. I just

9  want the Court to be aware of the full picture.

10     **THE COURT:** Sure, yeah, and that is consistent with

11  my understanding. I can't quote chapter and verse from the

12  rules, but the idea is that the certification is affirming the

13  factual content of the written responses and so to the extent

14  the factual content of the written responses has been

15  supplemented, then that's why a new verification would be

16  required.

17     **MR. BADWAY:** Right.

18     **THE COURT:** All right. And so then the last dispute,

19  which seems like maybe the thorniest, has to do with emails.

20     Defendant tells the Court that Liaigre -- I hope I'm

21  pronouncing that somewhat close; it's probably more of a

22  Spanish pronunciation than a French pronunciation -- but that

23  Liaigre has not produced a single responsive email they write

24  in their letter brief. They have produced documents, but that

25  they were expecting to get some emails and haven't gotten

6

1   emails yet.  And I understand from Liaigre's brief that their

2   position was that the parties agreed to rolling production, but

3   it was unclear to me if there is a search for emails underway,

4   if you anticipate that there will be emails produced, and if so

5   when, and what's being done to find them.

6           So maybe I'll let Mr. Badway address that first.

7           **MR. BADWAY:**  Sure.  Your Honor, I frankly wish that

8   this had been the question that had been asked by Defense

9   Counsel because I would have been pleased to answer it, so I'm

10  going to answer it for you, and also Defense Counsel as well

11  now, too.

12          Liaigre actually retained a vendor.  It's Liaigre's

13  policy, it's an unwritten policy Liaigre does not have any

14  written policies on emails.  We have already said that in our

15  responses to interrogatories.  And of course I also believe

16  that this would be a topic for the 30(b)(6) deposition when

17  that is held, as well, too, which I believe will be coming

18  before your Honor to decide some other issues, but I'm not

19  going to get into that, but I want to get back to -- I want to

20  stick to the emails.

21          Liaigre hired an email vendor to do a search of all

22  the relevant potential custodians in their emails.

23          Liaigre only retains emails for one year.

24          We have many emails, but they are privileged because,

25  of course they deal with the litigation, nothing to do with the

1   actual registrations or the intellectual property at issue in

2   this particular case.

3        We have had some success trying to restore emails

4   from the 2010s, from the 2010s, some success, not a whole heck

5   of a lot of emails and we're not even certain if they directly

6   relate to the marks that are in -- the copyrights here.

7        These particular items that are in question in this

8   litigation actually, your Honor, were -- many of them were

9   formed in the zeros, the 2000s, and so far we have had no luck

10  restoring any of those emails.

11       **THE COURT:**  All right.  When you have found emails,

12  have you been running key word searches against them?  Or have

13  you been relying on the custodians to tell you what folders

14  might have relevant emails?  Or how have you been locating

15  potentially relevant emails?

16       **MR. BADWAY:**  We've done it by people, by all the

17  people identified who had something to do with these particular

18  designs, and also the names -- it's my understanding the names

19  of the particular designs in question in this case, those are

20  the terms that we've been using.  We've tried to as broad a

21  search as possible.

22       We just -- my understanding is that many, many emails

23  were found just over the past year because of all the hits that

24  happened because of the litigation, and we, of course, are

25  planning on exercising a privilege over those, but nothing so

8

1    far directly, your Honor, frankly, from what I can gather, to

2    even the emails from the 2010s that they found, directly or

3    indirectly that deal with the designs in question in this

4    particular case.

5            But under our continuing obligation, I've asked our

6    vendors -- I have asked the vendor to go back and to look again

7    and to try to determine, and the vendor actually said that they

8    were doing that anyway, determine if there was any other emails

9    that they could find.

10           Let me back up just a little bit, Judge, so I can

11   tell you this.

12           Liaigre has one **(recording malfunction)** only on that

13   server.  There would -- has an automatic delete function after

14   one year.  And given the fact that this litigation happened

15   last year, 2019, it wasn't turned off.

16           **THE COURT:**  All right.  Well let me ask you, with

17   regard to the production of emails that you have found, or of a

18   privilege log, what is your estimate as to when that will be

19   given to the other side?

20           **MR. BADWAY:**  What I was hoping to do is I was hoping

21   to get a final confirmation from the vendor after all the

22   searches have been performed.  We're in the process of doing a

23   privilege log with all of the emails, and I don't anticipate

24   that taking a very long time because we've already been doing

25   it as we've gone along.  I'm just hoping --

1          Judge, let me -- let me just back up a little bit

2    because I found something very telling in the papers that were

3    put forward by the Defendants.

4          They claim the only thing we've produced is good

5    stuff for us.  I'm telling the Court that from what I

6    understand from my clients, there was good stuff for us, again,

7    the Plaintiff, in those emails.  So I have -- we have a vested

8    interest in trying to recover them, and that's what we're

9    trying to do.  And so, yes, the privilege log, I think,

10   probably will be in another week or two once I can get

11   confirmation from the vendor.  And then once I have all of

12   that, if there's anything responsive of those emails -- and

13   frankly, Judge, I'm really hoping, your Honor, that there is.

14   I can't tell you how much I believe that **(recording**

15   **malfunction)** there were emails that support the contentions and

16   affirmative defenses that we have in this particular case, but

17   I don't have them because of the email policies that Liaigre

18   have right now, and I'm hoping that **(recording malfunction).**

19          **THE COURT:**  Can you tell me how your anticipated

20   schedule for producing a privilege log and a final confirmation

21   about what emails you have or haven't been able to find, how

22   does that match up with the schedule for **(recording**

23   **malfunction)**?

24          **MR. BADWAY:**  Depositions are ongoing right now.  I

25   believe we've taken two and the defendants are in the process

1    of taking their second deposition as well.  And, you know, from

2    our perspective, if there are any responsive documents that we

3    find and we turn over that relate to a particular witness that

4    has already been taken, we're more than happy to reproduce for

5    a very short time that particular witness so that they can do

6    that.  They can depose **(recording malfunction)** documents are

7    produced.

8              I should also mention to the Court that discovery

9    doesn't end, I believe, until November 4th if I'm not mistaken,

10   I think that's the discovery end date, and we're also amenable

11   to pushing it back as well, Judge.

12             **THE COURT:**  So as of today is there a date by which

13   you can commit to provide a --

14             **MR. BADWAY:**  Yes.

15             **THE COURT:**  -- privilege log and either a

16   supplemental written response to the RFPs if that's wanted or

17   some sort of a representation that the search has been complete

18   and that the initial responses are still accurate?

19             **MR. BADWAY:**  Yeah, the 23rd, your Honor, just a week,

20   Judge, that's all I'm going to need.  This has been an ongoing

21   process.  We've been doing it -- we've been doing this process

22   ever since the spring, even during -- you know, when our

23   clients first got back, you know, where they had some access

24   and everything, we've been looking for this information and

25   we've been told, you know, we've been told that, you know, they

1   only had a one-year policy.  When people at the company did

2   searches, you know, they found nothing, and that's why we went

3   and did the next step, your Honor, to get the vendor and have

4   the vendor do it because, again, Judge, you know, we want -- we

5   took the next steps to do that.

6          **THE COURT:**  All right.  Well, then, **(recording**

7   **malfunction)** Ms. Sandoval, if you think there's something they

8   should be searching, other than their server or some other

9   avenue that is not being explored or that hasn't been disclosed

10  to you about how they're conducting these searches that you

11  want to comment on or anything else here?

12         **MS. SANDOVAL:**  Thank you, your Honor.

13         **MR. BADWAY:**  Your Honor -- your Honor, can I just --

14  this is Ernest Badway, and I'm sorry for interrupting

15  Ms. Sandoval, I just want to offer something, your Honor, okay?

16         If Ms. Sandoval believes that there are terms --

17  before she answers this, if she believes that there are terms,

18  I told you what we did, but if she believes there are other

19  terms, send them along, we'll have the vendors search for them

20  in the next week.

21         **THE COURT:**  Okay, I appreciate that offer, and now

22  we'll hear from Ms. Sandoval.

23         **MS. SANDOVAL:**  With respect to the offer, it would be

24  helpful, Mr. Badway, if you sent over the search terms and

25  custodians -- the names of custodians that you're **(recording**

1    **malfunction)** and we'll review them and add any additional terms

2    accordingly.

3              But I will say that this document dispute is not just

4    about emails, that's one piece of it and I'll address that

5    piece first.

6              When I took Mr. Rawlins' (phonetic) deposition

7    yesterday, his take on the email retention policy seemed to be

8    different.

9              He testified that he had emails going back to the

10   2000s that related to the projects where the designs were

11   created.  So I don't know if there -- if he just has emails

12   saved on his specific computer that may be different than

13   what's on the server, we didn't get into that yesterday.

14        `    He did say, however, that no one had asked him

15   specifically to search for his emails and he had not conducted

16   any searches in his email for responsive documents.

17             This morning Mr. Cassidy (phonetic), who is in New

18   York, also said he had not been asked to search his emails

19   either and had not searched his emails regarding these issues.

20             So I would ask the Court and Mr. Badway if they could

21   also check in with the custodians themselves.  It's possible

22   they have emails saved on their hard drives that are not on the

23   server that may very well may be responsive.

24             And --

25             **MR. BADWAY:**  Can I address that, your Honor?  Could I

13

1    -- oh, okay.

2           **THE COURT:**  Why don't we let Ms. Sandoval finish and

3    then we'll come back to you.

4           **MR. BADWAY:**  Sure.

5           **MS. SANDOVAL:**  And then the other issues are that we

6    just don't know what it is that Plaintiff's Counsel is

7    withholding or what documents they do or do not have.

8    Mr. Badway has been representing that the document production

9    is ongoing, but we've requested a number of other documents

10   besides emails.  We've requested documents, for example, about

11   the first sale of the furniture wherever -- in whichever

12   country that happens to be, and we have not received any

13   purchase orders, sales receipts, or anything regarding those

14   first sales, and perhaps they don't have them, but we just need

15   an answer regarding whether they have those documents or not.

16          We also asked for the introductory chapter for

17   Liaigre's three books that were published, and if they have

18   them, then they need to produce them; if they don't, we need to

19   know if they don't have them.

20          So we're also asking the Court and Mr. Badway to

21   either provide supplemental responses or declarations stating

22   that they've searched for all of the responsive documents that

23   they're going to produce and either produce them or say that

24   they don't have them.

25          **THE COURT:**  Mr. Badway, you can address that --

14

1          MR. BADWAY:  Oh, I (indisc.), I jumped the gun again

2  -- I didn't want to jump the gun again, your Honor,

3  (indisc.) --

4          THE COURT:  That's okay.

5          MR. BADWAY:  -- until Ms. Sandoval was done.

6          Your Honor, I want to address the first issue.

7          My understanding of Mr. Rawlins' testimony yesterday

8  is not the same as Ms. Sandoval's.  What he -- that's simply

9  not my understanding of what he actually said.

10          What he actually said was that they were, in his

11  understanding, they were thousands of emails about a particular

12  design that she was questioning him about, and that this was

13  back in the 2000 period of time, not even the 2010 period of

14  time, and that those emails, it's my understanding because we

15  knew this would be an issue today, that he did not -- this is

16  true, he did not search for anything on his computer and that's

17  absolutely accurate.  We asked no one to search for anything

18  because we asked for the vendor to search and for internal

19  executives at the company to search because of the fact that we

20  did not want to then be accused, as your Honor has already seen

21  with this very contentious litigation, and I've used this in

22  other cases, this process as well, we did not want to be

23  accused that emails "disappeared," (quote/unquote).  That's why

24  none of the individuals were asked to search.

25          All of the emails, it's my understanding, actually

1    appear on the server and that the computers that they had in

2    the 2000s, in the 2000s -- it's now 2020 -- are not the same

3    computers.  So that's why -- that's why those two reasons; one,

4    we wanted integrity in the search process; and two, we -- there

5    couldn't have been any emails that related to these particular

6    designs because we're not dealing with the same computers.

7    That's --

8              **THE COURT:**  Well, let me just ask a clarifying

9    question there.

10             **MR. BADWAY:**  Sure.

11             **THE COURT:**  I understand that the server deletes

12   emails after one year, but if someone had saved it to their

13   hard drive, it wouldn't necessarily be subject to that

14   automatic deletion protocol.  And while I understand that

15   people switch computers from time-to-time, if someone might

16   have the same computer for two years or three years, like

17   there's at least a theoretical possibility that there could be

18   emails that are two or three years old that one of the

19   custodians might have saved to their hard drive.

20             **MR. BADWAY:**  My -- I will double-check on this, your

21   Honor, I will go back and check again.  My understanding is the

22   vendor was able to access the individual computers through the

23   Liaigre system, but I will go back and I will confirm that.

24             And what I will also offer to the Court, too, I will

25   also ask them if they haven't done that, to search each of the

16

1  individual computers to see if there are any emails or any

2  other responsive documents on those individual computers.

3         **THE COURT:**  All right.  It sounds like, and we had

4  talked about this before, that it will ultimately be helpful

5  for Liaigre to provide a -- it doesn't have to be a declaration

6  -- but from Counsel that says what was done, that provides a

7  list of the custodians, the search terms that were used, if

8  there were date parameters or if the vendors searched --

9         **MR. BADWAY:**  Yeah.

10        **THE COURT:**  -- exactly, you know, these kinds of

11 questions --

12        **MR. BADWAY:**  Sure.

13        **THE COURT:**  -- they search individual hard drives,

14 albeit remotely, so that the persons using the computers

15 weren't aware of the searches, or did they go into people's

16 offices and search their hard drives, or whatever they did so

17 that Ms. Sandoval (audio malfunction) that, and if she can see,

18 you know, a hole in the methodology, that she can point that

19 out to you so that it can be addressed.

20        **MR. BADWAY:**  Yeah.  Judge, just like I'm saying to

21 you now, I have no problem putting together a letter like that

22 and providing it, none whatsoever.

23        **THE COURT:**  Okay.  And then with regard to

24 supplemental answers, typically someone should be able to tell

25 by reading an answer to an RFP if responsive documents exist or

1    not, and so if the initial responses said something like "Well,

2    we'll look for it and we'll produce it if we find it," then

3    those are often the kinds of responses that need to be

4    supplemented to say, "We have looked for it and we produced

5    it," or, "We have looked for it and we can't find it".

6        **MR. BADWAY:**  For example, your Honor, I think one of

7    her problems was about the first sale.  I believe that

8    information was produced, but I'll go back and verify that.

9        And this introductory chapter business, this is news

10   to me, it's the first time I'm hearing about it.  And I'm just

11   looking at Counsel's letter -- Counsel's letter to the Court as

12   part of this discovery conference, and I don't see anything

13   about these first chapters.  This is news to me.  I'm not even

14   sure what first chapter she's talking about.  But is she

15   suggesting Mr. Liaigre wrote a book and that's what this is

16   about?  I'm not even sure.

17       **MS. SANDOVAL:**  Mr. Badway, you may not be familiar

18   but you've produced pages from three books that were about

19   Liaigre's furniture and --

20       **MR. BADWAY:**  I am familiar about that, but I'm not

21   familiar about this particular request that you're making.

22   It's not even in your letter but I'll go back and look.

23       **MS. SANDOVAL:**  Right.

24       **MR. BADWAY:**  And frankly, if it's already been

25   published, it's out there, if we've got it we'll give it to

18

1    you.  It's not a big deal.

2         **THE COURT:**  What I understand the gist of the

3    Defendants' request to be is kind of on a broader scale, that

4    they just want to know as to each of the RFPs that either

5    documents have been produced or documents have not been found,

6    and that that may require supplemental answers.  And so I think

7    at this point it may be up to Liaigre to take a look at their

8    existing answers and based on what has actually occurred in

9    their search for and production of documents, to make a

10   determination if there are some of those interrogatories they

11   need to update.

12        **MR. BADWAY:**  Well, Judge, and I appreciate that and

13   we've actually done that.  And my understanding, just to be

14   very clear, we've conducted more than a reasonable search.  Any

15   time California has raised an issue about documents that they

16   believe exist that we haven't produced -- for example, in

17   response to Interrogatory Number 6, you know, we looked and

18   there were no documents responsive to it.  We double-checked,

19   we double-checked.

20        And we've produced already over 4,600 pages.

21   California Furniture has produced 2,298.  And just to telegraph

22   to the Court, you're probably going to get one of these on

23   their production soon, and Gina B has only produced 11 pages.

24        And what I find interesting is that we -- I can't

25   read their mind, your Honor, I only know -- I can't answer a

```
 1   question that says, "Oh, we've produced all responsive

 2   documents," you know.  I don't know what they view as

 3   responsive and then ultimately what this Court would review

 4   [sic] as responsive.

 5            If California Furniture, instead of being so verbose

 6   and grandiose about, you know, their position and their

 7   posture, if they'd just come out and say, you know, "Provide A,

 8   B and C documents, we don't see them in your production, do you

 9   have them," I'd go back and I'd double-check and I'd either

10   point them out to them or not.  And it seems to me that it's a

11   two-way street.  And, again, Judge, just like I did on this

12   phone call, like I did on the last phone call we had, if

13   they're just a little more forthright and to tell us exactly,

14   instead of looking for these broad, overarching, you know,

15   representations -- which I'm going to tell the Court right now

16   -- I will never make because discovery is continuing and I

17   can't declare that everything has been produced from now --

18   from now from time in memorial.  You know, I need to know what

19   they think hasn't been produced, that's usually how it works.

20            THE COURT:  Well, I'll guess I'll disagree with you

21   just a little bit on that.  I don't think that they have an

22   obligation to know what documents you have and to ask for them

23   specifically, but I do think that if you make a representation

24   in an initial discovery response that says, "We'll look for

25   this and we'll produce responsive documents," that at some
```

20

1    point the gist of the rule is that they're supposed to have

2    some assurance that that's occurred.   And so it could be a

3    supplement that says, "Well, we did look for it and, in fact,

4    we found something and we produced it," then that's great.

5            MR. BADWAY:   Okay.

6            THE COURT:   I guess, the alternative, "We looked for

7    it and then it turns out that at least as of today we haven't

8    found anything," then at least they know that they shouldn't be

9    looking for something, there's not something being withheld

10   based on some objection.   But we all understand that it may be

11   that somebody finds a box of something hidden in their garage

12   that nobody knew about or thought to look for, and that that's

13   not, you know, dishonest to have made a representation when you

14   didn't know about those materials, but at the same time, at

15   least as of today, they know that there's not a file that

16   you're still reviewing for privilege or documents that were

17   somehow overlooked.

18           MR. BADWAY:   Okay, Judge, and I'll put that in the

19   letter that I'm going to send to the Court, I'm more than happy

20   to do that.

21           THE COURT:   So it sounds like our conclusion here is

22   that the verifications for the supplemental interrogatory

23   responses are either going to come in today, Friday, or Monday,

24   and that by October 23rd, Liaigre will be able to provide a

25   privilege log and any responsive emails that may be found as a

1   result of the ongoing searches being conducted by their

2   e-discovery vendor.

3           And that Counsel will also provide a letter

4   describing the e-discovery search methodology in enough detail

5   that Opposing Counsel can understand it and comment on it, and

6   suggest changes if they think that that's appropriate.  And

7   that you will also evaluate the written responses that have

8   been provided to RFPs to-date, and make a determination as to

9   whether any of those need to be supplemented.  And if they do

10  need to be supplemented, let's say that those would need to be

11  served by October 27th, so a couple more days after that to get

12  supplemental written responses.

13          **MR. BADWAY:**  Right.  Or, your Honor, me saying that

14  there's no need to supplement.

15          **THE COURT:**  Right.  If you look at it and you say,

16  "Nothing has changed" -- but again, it depends on how those

17  initial responses are worded because if the wording is, "We'll

18  look for it and if we find something we'll produce it," then

19  that almost necessarily is the sort of thing that may need to

20  be supplemented because if you don't supplement it, the other

21  side is left in the dark knowing, you know, did you produce

22  something and I just didn't recognize it as being responsive to

23  that?  Did you never actually find anything?  It can be

24  unclear, so it should be clearer as to whether things were

25  found and produced or not.

22

1          MR. BADWAY:  Okay, no problem, your Honor.

2          THE COURT:  All right.  And from your perspective,

3    Ms. Sandoval, is there anything else that I've missed in that

4    sum-up that you think we need to add?

5          MS. SANDOVAL:  I would just like to add that

6    Mr. Badway had agreed to produce the deponents again, if

7    needed, given the supplemental production.  All of the

8    depositions are going to be ending, I think, next week except

9    for one, which will take place the following week.

10         THE COURT:  Right, there was that representation that

11   was made.

12         MR. BADWAY:  Yes.  As I said, "if."  If there were

13   any supplements.

14         THE COURT:  Right.

15         Okay.  Well that sounds like that addresses the

16   disputes that are in this set of letter briefs.  I understand

17   the parties are continuing to have disputes over document

18   production and depositions and so forth.  And I would just

19   commend to the parties to the extent they can, to set aside

20   time to schedule and talk and to try and be transparent.  And

21   that oftentimes if they are able to just clearly communicate

22   what's been done, what hasn't been done, what the reasons are

23   behind those decisions, that sometimes that can diffuse

24   disputes, not all disputes, but a great many disputes.  And

25   hopefully the parties will be able to try and tackle some of

1    those things that are before it so that it can -- they can both

2    move forward with completing discovery.

3            If the parties do feel like they are unable to

4    complete discovery by the deadline, this Court isn't the court

5    who would be able to change that; and I'm looking for something

6    that says that Judge Guilford is your judge, but it's now Judge

7    Klausner so you would need to talk with him if you wanted to

8    change those dates.

9            **MR. BADWAY:**  Okay.

10            **MS. SANDOVAL:**  Thank you, your Honor.

11            **THE COURT:**  Okay, thank you.

12            **MR. BADWAY:**  Thank you, your Honor.  Thanks.  Have a

13    great weekend, your Honor.

14            **THE COURT:**  You, too.

15            **THE CLERK:**  Court is now adjourned.

16        **(This proceeding was adjourned)**

17

18

19

20

21

22

23

24

25

24

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>October 21, 2020</u>

          Signed                                               Dated


*TONI HUDSON, TRANSCRIBER*

# EXHIBIT 3

**TO THE BADWAY REPLY DECLARATION**

**Rosales, Daniel M.**

| | |
|---|---|
| **From:** | Rosales, Daniel M. |
| **Sent:** | Monday, November 2, 2020 7:59 PM |
| **To:** | L. Lisa Sandoval; Scott, Melissa E.; Badway, Ernest E.; Leier, Ranelle; Grant, Jeff H. |
| **Cc:** | Scott Shaw |
| **Subject:** | RE: Liaigre v. California Furniture |

Counsel,

We write in response to your purported concerns regarding Liaigre's Status Report, Privilege Log, and supplemental production of documents.

First, we write to address your claimed concerns regarding spoliation.

Looking to the facts of this case, discovery has revealed that the Liaigre Furniture was designed and first sold in France then the United States long before 2019.  The Misaine Table was designed in 2010.  The Galion Cosole was designed in 2002-2003.  The Somaria Table was designed in 2008.  The Calme Plan Bench was designed in 2012.  The Maritime Chair was designed in 2008-2009.  The Bomarzo Side Table was designed in 1998. The Corvette Desk was designed in 2001.  The Centaure Table was designed in 2011.  Liaigre has provided evidence to show the dates of first sale of the Liaigre Furniture, the price, and the amount sold.  It is difficult to imagine how you have a good faith concern that there was any spoliation of relevant evidence.  *PersonalWeb Techs., LLC v. Google Inc.*, 2014 WL 4088201, at *4 (N.D. Cal. Aug. 19, 2014) (ruling that, particularly at late stage of fact discovery, where movant "does not suggest that the information is relevant to the merits of the case" the Court would not order discovery of litigation hold notice).

Your request, via conferral letter, of discovery regarding Liaigre's litigation hold notice, is wholly improper.  As you are no doubt aware, "litigation hold letters are not discoverable, particularly when a party has made an adequate showing that the letters include material protected under the attorney-client privilege or work product doctrine."  *City of Colton v. Am. Promotional Events, Inc.*, 2011 WL 13223880, at *2 (C.D. Cal. Nov. 22, 2011) (citing *Major Tours, Inc. v. Colorel*, 2009 WL 2413631 (D.N.J. Aug. 4, 2009)).

Your claim that you cannot determine whether Liaigre "recovered" emails is laughable and evinces your failure to review the documents produced prior to transmitting your unprincipled communication.  Liaigre has produced responsive, non-privileged communications and attachments from 2011-present as follows:

- **2011**.  PLA_004649-50.
- **2012**.  PLA_004655-56, PLA_004657, PLA_004659, PLA_004661.
- **2013**.  PLA_004610-4617, PLA_004648, PLA_005192.
- **2014**.  PLA_005124, PLA_005126, PLA_005145, PLA_005150-52, PLA_005157-59, PLA_005162, PLA_005188-89, PLA_005191, PLA_005200, PLA_005205, PLA_005210-5211, PLA_005222, PLA_005223, PLA_005224, PLA_005225, PLA_005226, PLA_005227, PLA_005233-005234, PLA_005239-5240, PLA_005244.
- **2015**.  PLA_005064, PLA_005065, PLA_005066, PLA_005068-69, PLA_005070, PLA_005071, PLA_005072, PLA_005073, PLA_005074-75, PLA_005076-78, PLA_5086, PLA_005087- 88, PLA_005089-90, PLA_005093, PLA_005101, PLA_005102-09, PLA_005110, PLA_005111, PLA_005112, PLA_005113, PLA_005114, PLA_005116, PLA_005117, PLA_005118-19, PLA_005120-21, PLA_005124, PLA_005127, PLA_005130, PLA_005138, PLA_005139-41, PLA_005142-44, PLA_005146-52, PLA_005153-59,  PLA_005160-61, PLA_5163, PLA_5166, PLA_5168, PLA_005172-73, PLA_005174-78, PLA_005179-80, PLA_005181-82, PLA_005183, PLA_005184-87, PLA_005188-89, PLA_005190, PLA_005192, PLA_005197-99, PLA_005201-02, PLA_005206-07, PLA_005208, PLA_005212-13, PLA_005216-18, PLA_005219, PLA_005220-5221, PLA_005228-5229, PLA_005230, PLA_005235-36, PLA_005238,  PLA_005248-50, PLA_005254-61, PLA_005262-66, PLA_005272-74, PLA_005275-

76, PLA_005285-87, PLA_005288-89, PLA_005290, PLA_005291-92, PLA_005299-300, PLA_005307-08, PLA_005309-10, PLA_005311-12, PLA_005313-15, PLA_005323, PLA_005361-62, PLA_005392-94, PLA_005395-97, PLA_005399-400, PLA_005414, PLA_005415-16, PLA_005430, PLA_005434-447, PLA_005448-49, PLA_005450, PLA_005451, PLA_005452-57, PLA_005458-59, PLA_005468-70, PLA_005497-5503, PLA_005506-09, PLA_005510-13, PLA_005514-20, PLA_005521-23, PLA_005524-26, PLA_005527, PLA_005532-33, PLA_005537, PLA_005539, PLA_005542-43, PLA_005552, PLA_005556-57, PLA_005561-62, PLA_005563-64, PLA_005565-67, PLA_005569-70, PLA_005571-79, PLA_005580, PLA_005588, PLA_005589-90.

- **2016**. PLA_004365-37, PLA_004368-40, PLA_004341-46, PLA_005251-53, PLA_005267-71, PLA_005277-78, PLA_005281-84, PLA_005293-96, PLA_005297-98, PLA_005301-02, PLA_005303-06, PLA_005316-17, PLA_005318-22, PLA_005327, PLA_005328, PLA_005329, PLA_005331-33, PLA_005334, PLA_005336, PLA_005338, PLA_005348-52, PLA_005353-54, PLA_005355, PLA_005356-58, PLA_005359-60, PLA_005363-65, PLA_005363-67, PLA_005368, PLA_005388-91, PLA_005398, PLA_005402, PLA_005406-08, PLA_005409-13, PLA_005423-25, PLA_005426-27, PLA_005428-29, PLA_005504-05, PLA_005624-28.
- **2017**. PLA_005067, PLA_005145, PLA_005174-78, PLA_005428-29, PLA_005591-93, PLA_005594-5624.
- **2018**. PLA_005169-71, PLA_005193-96, PLA_005203-04, PLA_005209, PLA_005231-32, PLA_005241-43, PLA_005340-44, PLA_005345-47, PLA_005369-76, PLA_005379-81, PLA_005382-86, PLA_005403-05, PLA_005417-20, PLA_005471-96.
- **2019**. PLA_004630-32, PLA_004633-34.

In addition, Liaigre produced a Privilege Log with 152 entries. The documents on Liaigre's Privilege Log include communications and documents from 2017-2020.

Under the circumstances, you have wholly failed to indicate why the Court would allow discovery of privileged communications between Liaigre and its counsel. Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *City of Colton*, 2011 WL 13223880, at *2. As set forth above, to the extent emails occurring long after the Liaigre Furniture was designed were even relevant, Liaigre has produced hundreds of documents spanning thousands of pages generated over the last decade. Clearly spoliation is not a reasonable concern, and your conferral amounts to no more than speculation. "Mere speculation that documents must have been destroyed . . . is insufficient to show spoliation." *FTC v. Lights of Am. Inc.*, 2012 WL 695008, at *4 (C.D. Cal. Jan. 20, 2012).

Second, we write to address your immediate threat of not only sanctions, but of extreme sanctions, including adverse inference, or terminating sanctions. As set forth above, you have failed to point to any actual facts or deficiencies that would give rise to a preliminary concern regarding spoliation. There is no basis to even examine Liaigre's privileged communications, much less to consider granting the relief you seek, and even less to convince the Court to take the extraordinary measure to issue the most severe sanctions possible.

The record reveals that this is merely the latest in your pattern of bad faith threats to seek sanctions against Liaigre over the course of the last few months. In the joint stipulation you filed, which the Court took off calendar moments ago, Liaigre stressed the well-established maxim that parties must be reasonable when they engage in discovery. Unfortunately, your conduct has been anything but reasonable.

Your first discovery motion, the motion to compel, was rendered moot before briefing was complete. Liaigre notified you it was moot when it provided dates for its witnesses, but you refused to withdraw the motion, and even threatened and requested sanctions against Liaigre. As the Court advised you, usually how it works when facing such a situation, you would respond and advise whether the provided dates work. You refused to engage in good faith discovery on this very basic level. After your motion was substantially denied, and weeks after Liaigre provided dates as it promised, you claimed that Scott Shaw had a conflict during the dates provided, so Liaigre would have to propose alternative dates. Liaigre provided three alternative dates for its witnesses. During the depositions, it was clear that Scott Shaw did not attend many of the depositions, and at times an additional attorney (who has not bothered to enter an appearance in this matter) stood in. This directly contradicts your representation that Liaigre would have to provide alternative dates because one of the attorneys of record was "unavailable."

Your second motion sought a protective order regarding Liaigre's 30(b)(6) notices on specious grounds.  In substance, you asked the Court for an order declaring that the company which designed and sold the products at issue would not have to talk about the design and sales of the products at issue.  The Court largely disposed of that motion without bothering to waste its time granting it a hearing.  (Doc. No. 66).  Before you filed that motion, however, during the conferral process, you threatened Liaigre with sanctions.

Liaigre then brought a similar motion for a protective order regarding your 30(b)(6) notice, notifying the Court that it was seeking equal treatment, and that Liaigre would allow the order setting the scope of your 30(b)(6) witness' testimony to stand as the law of the case.  Liaigre notified you with adequate time of its intention to do so.  You failed to conduct yourself in a reasonable manner, threatened Liaigre with sanctions, purported to show up to a virtual deposition, and then in fact sought sanctions against Liaigre.

You have now attempted to bootstrap new purported concerns that you claim arose following the informal discovery conference that were not at issue during the discovery conference.  Surprising to none, you have immediately threatened Liaigre with sanctions yet again.

Your threat to seek the most severe sanctions imaginable smacks of bad faith.  "The sanctions of dismissal or inference drawing are serious matters." *Abu-Lughod v. Calis*, 2014 WL 12589357, at *1 (C.D. Cal. May 23, 2014).  Particularly where, as here, you cannot point to a single violation of a court order made by Liaigre.  *See id.*  ("Of course, the predicate for any action is that there has been a violation of a court order.").

Moreover, your repeated filing of baseless discovery motions in an effort to increase fees, which in your case are paid by an insurance carrier, may itself constitute sanctionable conduct.  "In addition to Rule 37, 28 U.S.C. § 1927, entitled 'Counsel's liability for excessive costs,' permits the award of sanctions against any attorney 'who so multiplies the proceedings in any case unreasonably and vexatiously[.]'"  *Benke v. Departure Agency, Inc.*, 2012 WL 12885102, at *9 (C.D. Cal. Oct. 9, 2012).  As the United States Supreme Court stated: "§ 1927 does not distinguish between winners and losers, or between plaintiffs and defendants . . . . It is concerned only with limiting the abuse of court processes."  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980).  There is no question that "§ 1927 applies to discovery disputes."  *Benke*, 2012 WL 12885102, at *9 (citing *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1446-47 (11th Cir. 1985)).

Within this District in particular, Courts have taken note of conduct similar to yours.  "The strategy employed by Defendants and their counsel was equivalent to a legal game of 'chicken', hoping to scare off [Plaintiff] with baseless threats of sanctions in order to make this action disappear."  *Andrews v. All Green Carpet & Floor Cleaning Serv.*, 2015 WL 3649585, at *6 (C.D. Cal. June 11, 2015).  Moreover, in determining whether a case is "exceptional" under Lanham Act 15 U.S.C. § 1117(a), the Court may consider "the unreasonable manner in which the case was litigated."  *WBS, Inc. v. Croucher*, 2020 WL 1169387, at *3 (C.D. Cal. Mar. 11, 2020) (justifying allocation of attorney's fees to prevailing party under Lanham Act exceptional case standard where counsel "pursued certain strategies for no reason other than to inconvenience opposing counsel, and in some instances may have acted in opposition to his client's wishes").

Finally, although it should not require repeating, "a frivolous motion for sanctions can be grounds for sanctions itself."  *Bangkok Broad. & T.V. Co., LTD. v. IPTV Corp.*, 2010 WL 11523703, at *6 (C.D. Cal. Feb. 12, 2010), *order enforced*, 2010 WL 11519581 (C.D. Cal. Mar. 24, 2010) (substantial chain citations omitted).

We trust this addresses your purported concerns.  We suggest you reconsider your baseless claims regarding spoliation and seeking severe sanctions against Liaigre.  We are willing to confer further regarding these issues as necessary.  In the meantime, exercise due caution and govern yourselves accordingly.

Dan

**Dan Rosales, Esq.**

**Fox Rothschild LLP**
d: (212) 878-7980

---

**From:** L. Lisa Sandoval <lsandoval@calljensen.com>
**Sent:** Wednesday, October 28, 2020 7:22 PM
**To:** Scott, Melissa E. <mscott@foxrothschild.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Rosales, Daniel
M. <DRosales@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>; Grant, Jeff H.
<jgrant@foxrothschild.com>
**Cc:** Scott Shaw <sshaw@calljensen.com>
**Subject:** [EXT] Liaigre v. California Furniture

Counsel,

We are in receipt of Liaigre's latest supplemental document production of 299 documents, consisting of emails and
attachments, and Liaigre's Status Report Following Informal Discovery Conference [Dkt. 63]. The Status Report,
however, does not explain why Liaigre only identified Christophe Caillaud, Guillaume Rolland, Tim Cassidy, Thais Roda,
and Frauke Meyer as custodians, but not any of the other persons identified in depositions as potentially  having
information on the furniture at issue. And the Status Report also does not identify any date parameters used in the
searches, or whether hard copies of documents were searched. We understand that Liaigre believes it "has met all of its
discovery obligations," although the Status Report does not explain why it believes that.

Most astonishingly, the Status Report fails to address whether Liaigre was able to recover the emails that were
automatically deleted, seemingly, after the commencement of this litigation. At the informal discovery conference,
Ernest Badway represented that Liaigre "has an automatic delete function after one year. And given the fact that this
litigation happened last year, 2019, it wasn't turned off." Hrg. Tr. 8:13-14. Although we had been requesting the status
of the Liaigre's document production including emails for months, the hearing on October 16, 2020 was the first time
you notified us of this potential spoliation issue.

As you are aware, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document
retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."
*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). The district court may impose sanctions for such
spoliation under (i) "the inherent power of federal courts to levy sanctions in response to abusive litigation practices,
and (ii) the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit
discovery." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Courts may sanction parties for spoliation of
evidence by, *inter alia*, dismissing the claim of the party that destroyed the evidence, instructing the jury to draw an
inference adverse to the party destroying the evidence, and/or imposing monetary sanctions. *See In Re Napster, Inc.
Copyright Litig.*, 462 F.Supp.2d 1060, 1066, 1077-78 (N.D. Cal. 2006). Moreover, a court "may impose sanctions against a
party that merely had notice that the destroyed evidence was potentially relevant to the litigation." *Id.* (imposing
evidentiary and monetary sanctions for Napster's deletion of emails).

Defendants rightfully need to assess the extent of Liaigre's potential destruction of documents and their relevance to
this lawsuit. To that end, please provide us with the following information no later than Friday, October 30, 2020.

1. Was Liaigre able to recover and search all of the emails that were automatically deleted after the
   commencement of this lawsuit?
2. If not, which custodians' emails were not recoverable and during which time period?
3. When was the automatic one-year delete function ultimately turned off?
4. Did the deletion of emails only affect Liaigre US's email, or Liaigre France's email too?
5. Did Liaigre issue a legal hold notice related to this lawsuit? If so, when?
6. Were there any other documents that were deleted after Liaigre reasonably anticipated this litigation?

Best regards,

4

Lisa



L. LISA SANDOVAL
ASSOCIATE

TELEPHONE 949.717.3000
FACSIMILE 949.717.3100

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

# EXHIBIT 4

**TO THE BADWAY REPLY DECLARATION**



LAWYERS

610 NEWPORT CENTER DRIVE, SUITE 700
NEWPORT BEACH, CALIFORNIA 92660

TELEPHONE 949.717.3000
FACSIMILE 949.717.3100

CALLJENSEN.COM

November 19, 2020

OUR FILE NUMBER
CAL19-01

**BY EMAIL**

Jeffrey H. Grant, Esq.
Fox Rothschild LLP
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
jgrant@foxrothschild.com

Ernest E. Badway, Esq.
Daniel M. Rosales, Esq.
Fox Rothschild LLP
101 Park Avenue, 17th Floor
New York, NY 10178
EBadway@foxrothschild.com
drosales@foxrothschild.com

Ranelle A. Leier, Esq.
Fox Rothschild LLP
222 South Ninth Street, Suite 2000
Campbell Mithun Tower
Minneapolis, MN 55402-3338
rleier@foxrothschild.com

Melissa Scott, Esq.
Fox Rothschild LLP
747 Constitution Drive, Suite 100
Exton, PA 19341
mscott@foxrothschild.com

Re:     *Liaigre, Inc. v. California Furniture Collection, Inc., et al.*
        United States District Court, Central District, Case No. 8:19-cv-01160-AG-KES

Dear Counsel:

We write on behalf of Defendants and Counter-Claimants California Furniture Collection, Inc. and Gina B & Company Inc. (together, "Defendants") regarding documents responsive to Plaintiff Liaigre, Inc.'s requests for production of documents that are covered by the attorney-client privilege and/or work product doctrine.

In the Ninth Circuit, "counsel's communications with the client and work product developed once the litigation commences are presumptively privileged and need not be included on any privilege log." *Ryan Inv. Corp. v. Pedregal de Cabo San Lucas*, 2009 WL 5114077, at *3 (N.D. Cal. Dec. 18, 2009); *see also Kellgren v. Petco Animal Supplies, Inc.*, 2016 WL 4097522, at *6 (S.D. Cal. July 7, 2016) ("This Court will not . . . compel the production of a privilege log for confidential communications between counsel and client that occurred after this lawsuit was filed."); *Hernandez v. Best Buy Co., Inc.*, 2014 WL 5454505, at *9 (S.D. Cal. Oct. 27, 2014) ("[I]t is not necessary for the privilege log to list communications between counsel and client after the commencement of this litigation.").

LITIGATION   •   REAL ESTATE   •   EMPLOYMENT   •   INTELLECTUAL PROPERTY   •   CLASS ACTIONS

Fox Rothschild LLP
November 19, 2020
Page 2

We have reviewed all of the documents responsive to Liaigre's requests for documents. Accordingly, because all of the privileged responsive documents are for counsel's communications with Defendants after the filing of the Complaint in the above-referenced action on June 11, 2019, Defendants are not producing a privilege log.

Defendants reserve the right to assert privilege objections with respect to all of the communications and documents covered by the attorney-client privilege and work product doctrine that were created after the commencement of the above-referenced litigation.

Please let me know if you have any questions.

Very truly yours,

L. Lisa Sandoval
For Call & Jensen
A Professional Corporation

LLS:jm

# EXHIBIT 5

**TO THE BADWAY REPLY DECLARATION**

**Rosales, Daniel M.**

| | |
|---|---|
| **From:** | Leier, Ranelle |
| **Sent:** | Thursday, January 14, 2021 8:44 PM |
| **To:** | Scott P. Shaw; Guillermo, Alexandrea M.; Zach Kachmer; Kaye Holst |
| **Cc:** | Grant, Jeff H.; Scott, Melissa E.; Rosales, Daniel M.; Badway, Ernest E. |
| **Subject:** | RE: Liaigre, Inc. v. California Furniture Collection - Case No. 8:19-cv-01160 |

Scott:

I write in response to your email from yesterday.  Here is Liaigre's response to the issues your raised.

1.      Briefing Schedule.  We propose the following joint briefing schedule for the parties' summary judgment motions:

        Opening Briefs Due:      Monday, February 8, 2021
        Opp'n Briefs Due:        Monday, March 15, 2021
        Reply Briefs Due:        Monday, April 5, 2021
        Hearing Date:            Monday, May 17, 2021

With regard to additional pages, we are willing to jointly request 5 additional pages for the parties' opening briefs and opposition briefs.

2.      Expert Depositions.  We are willing to extend the deadline for expert depositions, but before doing so, we would like to agree to a specific new date, after conferral regarding the experts' availability.  Please let us know the dates your experts are available as soon as possible.  Here are available dates for Liaigre's experts you asked to depose:
                Charles Mauro – January 22.  If this date does not work, we can ask for additional dates.
                Pierre Greffe and Flora Donaud – January 27, February 2, and February 3 starting at 2:30 p.m. Paris time.  Both request a French interpreter.

Assuming we are able to agree on a new deadline, we don't believe we need to ask the Court's permission for an extension.

3.      Meet and Confer
We do not agree with your characterization of our meet and confer.  The only issue that we deferred to Ernie and Melissa on was the briefing schedule, stating that we wanted to confer with them before agreeing to specific dates.  As you note above, we did discuss general dates during our call.  Our meet and confer call lasted over an hour, with the vast majority was devoted to the issues to be raised in the parties' motions for summary judgment.  We conferred in good faith and have meet our obligations under the rules.  Nonetheless, we respond to the issues you raised in your email.

4.      Standing
        •   You have acknowledged our position regarding ownership (including assignment) being controlled by French and not U.S. law pursuant to the Berne Convention, applicable provisions of the Copyright Act, and case law.  We disagree that we agreed to speak with our colleagues on this point further.  Our position has been and remains that French law controls the issue of copyright ownership, including the grant of an exclusive license.
        •   Even if we assume for the sake of argument (which Plaintiff does **not** concede) that U.S. law controls the issue of whether Liaigre SAS granted an exclusive license to Liaigre, Inc., we disagree that *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978 (9th Cir. 2017) defeats Liaigre, Inc.'s legal status as Liaigre SAS's exclusive licensee with standing to sue to enforce the copyrights in the U.S.

- o The *DRK* court acknowledged "that the essence of an 'exclusive' license under the [Copyright] Act is that 'the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others." *DRK Photo*, 870 F.3d at 984 (citation omitted).
    - ▪ Here, in 2012 Liaigre SAS granted Liaigre Inc. the exclusivity to distribute the Liaigre collections of furniture, lighting and accessories in the U.S.  The facts demonstrate that Liaigre Inc. has since maintained its own budgets and coordinated with its own and independent showrooms, entered directly into contracts, and this right has not been subverted by Liaigre SAS.  This readily shows that Liaigre Inc. is Liaigre SAS's exclusive licensee.
    - ▪ Given that Liaigre Inc. received a promise from Liaigre SAS that Liaigre Inc., *and only Liaigre Inc.*, "will have the power . . . to authorize third parties to reproduce, distribute, and display" the furniture in the US, the facts of this case fall within *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1004 (9th Cir. 2015) and *Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013) where exclusive licensees were recognized as proper plaintiffs for standing to sue under the Copyright Act.
- Lastly, we note that you did not address the copying component of Liaigre's copyright claim.  Do you concede that, if ownership is established and Liaigre Inc. is the proper plaintiff, that CFC's products are substantially similar and CFC had access to the Liaigre Furniture, or CFC's products are strikingly similar or identical to Liaigre's products?  *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019).  It sounds like you concede liability if ownership is shown.

5.   Trade Dress
- Your representation is inaccurate.  Our trade dress theory is set forth in our Complaint, and was further refined through written discovery responses and documents produced.  In discussing Liaigre's design aesthetics present in the Liaigre Furniture and further established through advertising from 2004 to present, we were discussing your challenge to asserted trade dress under the four *Disc Golf* factors.  Your argument is now decidedly different, manufactured after conferral, and was not discussed previously.  To be clear, the design aesthetics identified with respect to individual elements of the Liaigre Furniture demonstrate how those aesthetics inform the overall product design and Liaigre's entire selling image, including the overall visual appearance of the Liaigre Furniture.  *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989).

- In support of our trade dress infringement claim, we have identified how we meet the four *Disc Golf* factors, and the evidence we will point to in order to support secondary meaning.

- Your statement "Here, the fact that Plaintiff is asserting protection for *eight separate and distinct* furniture products defeats Plaintiff's trade dress claim, because there is no source-identifying characteristics of the products individually or collectively" is conclusory, a product of tautological reasoning, and you do not provide any factual support for this assertion.  In short, it requires no further response in light of the substantial evidence we have produced and pointed to during conferral.

6.   CA Common Law Claims
- It bears pointing out that you interrupted Dan while he was explaining our theory and while he was citing case law.  You cited none and now you provide some.  Again, here are the cases we cited during conferral until we were interrupted.

- Regarding California common law unfair competition, "[t]he tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection . . . According to some authorities, the tort also includes acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's

reputation in the market." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992); *see also Rise Basketball Skill Dev., LLC v. K Mart Corp.*, 2017 WL 2775030, at *3 (N.D. Cal. June 27, 2017) ("A common law unfair competition claim differs from a Lanham Act claim in that California's common law unfair competition tort provides a remedy for wrongful exploitation of trade names and common law trademarks that are not otherwise entitled to legal protection and is therefore broader in scope.") (citations omitted).

- Here, Liaigre's claim for CA common law unfair competition does not require the court to agree that Liaigre has enforceable trade dress. Rather, the court looks to CFC's status as an alleged serial infringer who was willing to, and did in fact, become a creator and purveyor of cheaper Liaigre copycat products in the relevant market. The court can look to the full scale of CFC's actions (to date Liaigre has identified sixteen products) and not just the 8/9 pieces of Liaigre Furniture over which Liaigre claims trade dress protection, to analyze Liaigre's CA common law unfair competition claim.

7.      Treble and Punitive Damages
- We informed you that we did not cite 1117(b) for treble damages. We stated this over the phone and you will not find this provision cited in our Complaint. To reiterate, we are seeking all costs recoverable under 1117(a) and any other applicable provision of the Lanham Act.

- Under 15 U.S.C. § 1117(a), a prevailing party may recover (1) the infringing party's profits, (2) damages sustained by the injured party, and (3) the costs of the action. *H.I.S.C., Inc. v. Franmar Intl. Importers, Ltd.*, 3:16-CV-0480-BEN-WVG, 2020 WL 6263649, at *1 (S.D. Cal. Oct. 22, 2020).

- The statute continues "The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. ***In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount***. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

    o   That is our basis for treble damages and attorney's fees.

- We spoke about punitive damages in the context of California Business and Professions Code. I believe the disagreement is one of semantics. We seek damages for "civil penalties" under UCL Section 17206, which allows courts to impose civil penalties for each violation of the UCL. In making its determination, courts consider any one or more of the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

We also take issue with your recitation with other parts of the discussion during our call. Because we don't feel it necessary or productive, this email does not purport to address all of the misstatements.

8.      We are available to meet and confer on your motion for sanctions and our similar motion prior to the filing of the SJ papers. As suggested, we are willing to confer on both motions at the same time. We are available on January 20. Your email is the first we are hearing that your motion for sanctions will include a request to exclude the rebuttal

==report of Liaigre's French law experts.  Please provide us with the basis for this motion.  Likewise, we will provide you
with basis for Liaigre's motion against CFC prior to the conferral meeting.==

Ranelle


**Ranelle Leier**
Partner
**Fox Rothschild LLP**
(612) 607-7247 direct
(612) 720-8951 cell
rleier@foxrothschild.com

---

**From:** Scott P. Shaw <sshaw@merchantgould.com>
**Sent:** Wednesday, January 13, 2021 12:49 PM
**To:** Guillermo, Alexandrea M. <AGuillermo@foxrothschild.com>; Zach Kachmer <ZKachmer@MerchantGould.com>;
Kaye Holst <KHolst@merchantgould.com>
**Cc:** Grant, Jeff H. <jgrant@foxrothschild.com>; Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M.
<DRosales@foxrothschild.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Leier, Ranelle
<rleier@foxrothschild.com>
**Subject:** [EXT] RE: Liaigre, Inc. v. California Furniture Collection - Case No. 8:19-cv-01160

Counsel –

Rather than continue to send separate e-mails, here is a list of the items I believe we need to address, and you are
obviously free to add or revise if I missed anything or made any errors.  I am also generally available this week and next
to confer further if you think it will help us resolve any issues.

1.  Prepare a Stipulation for the briefing schedule and page lengths for briefs regarding the MSJ briefs that will
    apply for both parties.  As Dan and Ranelle mentioned on the meet and confer call, they could not agree to
    anything on the call without talking to Ernest and Melissa, and Ranelle wanted to check her kids' Spring Break
    schedule.  As I mentioned, we are flexible so please send me a proposed Stipulation and we will likely agree to
    your proposal, but obviously we reserve our rights to make changes.  Assuming our hearing date is in May, we
    generally discussed filing briefs in early February, opposition briefs in early to mid-March, and reply briefs in
    April.  We also discussed stipulating to 5 additional pages for opening briefs and opposition briefs.


2.  Expert deposition.  Given the short window of time to complete expert depositions, I wonder if we should
    include in our Stipulation (above) a request to extend this date by a week or so.  I will defer to you and our
    witnesses, but Court in the CD of CA are very flexible when it comes to non-party witness scheduling issues, so
    whether we seek or Court Order or not I am sure we can informally agree.  Our only issue will be whether we
    will need the transcripts for the briefs, so please think about it and I am open to coordinating with whatever
    works best for both parties.


3.  Most of the issues we simply could not agree on during our MSJ meet and confer call, and Dan and Melissa said
    that everything would have to go through Ernest and/or Melissa in any event, but there were a few uncertain
    items that I will note below if you would like to confer further.

4. Standing. I explained our position that Liaigre, Inc. did not have standing to sue for copyright infringement as a non-exclusive licensee under the US Copyright Act and DRK Photo case, and Ranelle and Dan said your position is that question is controlled by French law. You also said you would speak further with Ernest and Melissa to see if we are simply going to agree to disagree on the French vs. US law, and if under US law you would agree that Liaigre, Inc. would not have standing. No it was unclear whether we agree or disagree that if US law controls, the undisputed facts demonstrate that Liaigre, Inc. is only a non-exclusive licensee.

5. Trade dress secondary meaning and functionality. We discussed these issues at length on our call, and yesterday I briefly reviewed Plaintiff's rebuttal expert reports, and it appears to me that Plaintiff is attempting to seek protection of the aesthetics of the furniture, which is a supposed to be protected with a design patent, not trade dress law. As I explained on our call, even unique, novel, and aesthetically pleasing products are not perceived or protected as "trade dress" simply because they are appealing to the eye or are artistic (as discussed in Plaintiff's rebuttal report). In our view, unless the product design itself serves the purpose of indicating to the public that only a single company makes the product, the product is not protected under trade dress law. Here, the fact that Plaintiff is asserting protection for *eight separate and distinct* furniture products defeats Plaintiff's trade dress claim, because there is no source-identifying characteristics of the products individually or collectively. We will ask the Court to find in favor of Defendants on the grounds that the Plaintiff is seeking to protect aesthetically functional "trade dress," which is improper because it would create a legal monopoly (since trade dress lasts forever, and design patents have limited duration).

6. CA common law claims. Dan mentioned a theory I was unfamiliar with on our call that the CA common law claims are broader than the federal claims and even if the federal claims are dismissed, the CA claims could proceed. I am happy to confer with Dan further to understand the basis of the CA claims, because in our written exchange prior to our meet and confer I thought we were on the same page that the CA claims remain or fall consistent with the federal claims. Our position is the CA claims are related so they will fall with the federal claims. *See Japan Telecom, Inc. v. Japan Telecom Am., Inc.*, 287 F.3d 866, 875 (9th Cir. 2002) (plaintiff's unfair competition claim under state law "fails because its related Lanham Act claims fail."). If you disagree, I am happy to confer further and consider your factual and legal positions.

7. Treble and punitive damages. I asked you to provide me with legal authority for Plaintiff's entitlement to treble damages under federal law and punitive damages under CA State law. For treble damages, you cited 1117(b), which applies in counterfeiting cases, not this case. You also referenced "exceptional case," which is the Lanham Act standard for seeking recovery of attorneys' fees. So I have not seen any basis for treble damages. As for punitive damages, I have only seen and heard alleged facts, but no legal authority that would entitle Plaintiff to recover punitive damages. My understanding is that punitive damages are not available under the Copyright Act, the Lanham Act, or California Business and Professions Code § 17200.

8. Motion for Sanctions. We would like to confer with you at least 5-7 days before we file our MSJ on our Motion for Sanctions to exclude the untimely documents and the rebuttal reports from Liaigre's French lawyers. Please provide us with a date. If you would like to confer over a similar type motion, please send me your position regarding the merits and the relief you intend to seek from the District Court Judge, and we can confer with you on the same date for our Motion.

Thank you.

**From:** Scott P. Shaw
**Sent:** Wednesday, January 13, 2021 11:38 AM
**To:** Guillermo, Alexandrea M. <AGuillermo@foxrothschild.com>; Zach Kachmer <ZKachmer@MerchantGould.com>; Kaye Holst <KHolst@merchantgould.com>
**Cc:** Grant, Jeff H. <jgrant@foxrothschild.com>; Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>
**Subject:** RE: Liaigre, Inc. v. California Furniture Collection - Case No. 8:19-cv-01160

Thank you.  We had also prepared notices for the two French Liaigre lawyers who Plaintiff disclosed as rebuttal experts, but we had set them for the same dates as your notices.  My thought is we should talk on the phone and try to coordinate dates and times, especially since a few will be on different time zones.  We will also need to ask the witnesses for their availability and plan accordingly.

Please let me know if you are available to confer tomorrow regarding dates and times.

**From:** Guillermo, Alexandrea M. <AGuillermo@foxrothschild.com>
**Sent:** Wednesday, January 13, 2021 10:44 AM
**To:** Scott P. Shaw <sshaw@merchantgould.com>; Zach Kachmer <ZKachmer@MerchantGould.com>; Kaye Holst <KHolst@merchantgould.com>
**Cc:** Grant, Jeff H. <jgrant@foxrothschild.com>; Scott, Melissa E. <mscott@foxrothschild.com>; Rosales, Daniel M. <DRosales@foxrothschild.com>; Badway, Ernest E. <EBadway@foxrothschild.com>; Leier, Ranelle <rleier@foxrothschild.com>
**Subject:** Liaigre, Inc. v. California Furniture Collection - Case No. 8:19-cv-01160

**CAUTION - External.**

Dear Counsel,

Attached please find Liaigre's Notice of Deposition of Lance Rake and Notice of Deposition of Nicolas Binctin in the above-referenced matter.

Thank you,
**Alexandrea Guillermo**
Paralegal
**Fox Rothschild LLP**
101 Park Ave.
17th Floor
New York, NY 10178
(212) 878-7909 - direct
(212) 692-0940 - fax
AGuillermo@foxrothschild.com
www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# EXHIBIT 6

**TO THE BADWAY REPLY DECLARATION**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LIAIGRE, INC.,  a Delaware Corporation

      Plaintiff,

   vs.                    No. 8:19-cv-01160

CALIFORNIA FURNITURE
COLLECTION, INC., d/b/a ROBERT
JAMES COLLECTION,  a California
Corporation; GINA B. & COMPANY,
INC., a California Corporation; and
DOES 1-10,

      Defendants.

_____


ZOOM-CONFERENCED DEPOSITION OF LANCE G. RAKE

Lawrence, Kansas

January 28, 2021


Reported by:
KENNETH T. BRILL
CSR NO. 12797


Job No. 4429955


PAGES 1 - 221

Page 129

```
 1    want to be able to flip through that, but I don't --
 2         MS. SCOTT:  Feel free.
 3         MR. SHAW:  Up to her.
 4    BY MS. SCOTT:
 5         Q.  Feel free.
 6         A.  It's been about an hour.  Can we make just a
 7    quick, five-minute break?
 8         Q.  Sure.
 9         A.  Thank you.
10         (Recess taken.)
11         MS. SCOTT:  All right.  We're back on the
12    record.  Ken, are you able to read back the last
13    question.
14              - - -
15         The court reporter read back as
16         follows:
17              "QUESTION:  Okay.  And you stated
18         in your report that you believe these
19         pieces of furniture, or at least you
20         consider them as potential influences
21         for the designs of various features of
22         the Liaigre furniture; correct?
23              "ANSWER:  Yeah, let's see what that
24         is.
25              "QUESTION:  For example, I'm just
```

Page 130

```
 1    going to grab one.")
 2              - - -
 3    BY MS. SCOTT:
 4         Q.  All right.  Mr. Rake, your answer was yes to
 5    that question, am I correct?
 6         A.  Yes, I think that's what I said.
 7         Q.  All right.  We can move on from there.
 8         All right.  Do you believe -- oh, do you know
 9    whether any of the pieces of furniture that you
10    reference in your -- the body of your report were actual
11    influences for the designs of the Liaigre furniture at
12    issue in this case?
13         A.  No, I don't know that.  I -- and I don't think
14    I say that in the report.
15         Q.  No, I'm just asking if you know.  Do you
16    believe any of these alleged earlier furniture
17    references are identical to the Liaigre furniture?
18         A.  I don't recall any of them being identical.
19         Q.  Now, earlier you said that -- oh, let me just
20    ask you this:  Can you state for me again what the --
21    what you believe the relevance is of these pieces of
22    earlier furniture to whether or not Liaigre's asserted
23    trade dress has -- is protectable?
24         A.  Let's -- just saying a lot of these forms have
25    existed previously, that that whole body of work of all
```

Page 131

```
 1    kinds of designs that have come before us have, you
 2    know, continued to influence designers as -- as we go
 3    on, and probably in slightly different ways.
 4         So every designer might -- even if we're all
 5    influenced by certain Art Deco designers, we might
 6    take -- all take an influence, but we might all take
 7    things slightly different directions, still could be
 8    derived from previous work.
 9         So it's not -- you know, I think I said in the
10    report a design doesn't exist in a vacuum, you know, it
11    comes from -- from sources generally.
12         Q.  Is it your opinion that a furniture design
13    feature that's influenced by an earlier furniture
14    reference can never achieve trade dress protection?
15         A.  No, that's not my belief.
16         Q.  Okay.  So it is possible that a furniture
17    design feature that was in some way influenced by maybe
18    an earlier era of furniture design could achieve trade
19    dress protection at some point?
20         A.  Other things have to happen, yeah, but --
21         Q.  But it's possible?
22         A.  That's possible.
23         Q.  In several places throughout your report, you
24    note that certain features or elements of the Liaigre
25    furniture are not, quote, novel.  For example, in
```

Page 132

```
 1    paragraph 41, you state "The use of bronze is not unique
 2    or novel."
 3         Do you see that?
 4         A.  I do see that, yes.
 5         Q.  Okay.  And for example, in paragraph 68 where
 6    you are discussing Liaigre's Calme Plat bench, you're
 7    discussing the legs and you say, "This expression is not
 8    innovative, novel, or unknown in the art prior to the
 9    Calme Plat Bench."  Do you see that?
10         A.  Yes, I do.
11         Q.  Okay.  Is it your opinion that for a furniture
12    design feature to achieve trade dress protection, it has
13    to be novel?
14         A.  I think it -- it can't be unremarkable.
15         Q.  Would you agree with me that there's a very
16    wide bridge between unremarkable and novel?
17         A.  It's just that if -- if something comes out
18    and it looks similar to a lot of things that people are
19    familiar with, we may not -- you know, it's
20    unremarkable, that's possible.
21         Q.  And all I'm trying to clarify is whether or
22    not you believe novelty of a design is a requirement for
23    trade dress protection?
24         MR. SHAW:  Asked and answered.
25         THE WITNESS:  No, I don't -- I don't believe
```

Page 133

1    that -- that that's required, no.
2    BY MS. SCOTT:
3        Q.   Okay.  Do you know that non-obviousness of a
4    design feature is required to achieve trade dress
5    protection?
6            MR. SHAW:  Calls for a legal conclusion.
7    BY MS. SCOTT:
8        Q.   You can answer.
9        A.   Non-obviousness, no, I don't think I used that
10   in -- in anything in the report.
11       Q.   And you said that you do a lot of expert work
12   in the area of patents; right?
13       A.   Yes, I do.
14       Q.   And novelty is a requirement in patent law;
15   correct?
16       A.   In some of it, as I recall, yeah.
17       Q.   And so is non-obviousness; correct?
18       A.   That's -- that's a term I know from -- from
19   patent stuff, yes.
20       Q.   With respect to the earlier furniture
21   references that you included in the body of your report,
22   did you do any research to see the quantity -- number
23   of -- or the quantity sold of each of those pieces of
24   furniture?
25       A.   No.

Page 134

1        Q.   Many if not all of the furniture pieces that
2    you included were designed somewhere between 50 and even
3    100 years before the Liaigre furniture; correct?
4        A.   Yeah, probably, if -- if you've looked at the
5    numbers, I'm sure.
6        Q.   Did you perform any research to determine
7    whether the purchasing public would associate the
8    designs of the earlier furniture with a single source?
9        A.   No, I didn't.
10       Q.   Now, we've talked a bit today already about
11   secondary meaning and you said you were familiar with
12   that term.  Can you explain to me what your
13   understanding of secondary meaning is?
14       A.   It -- it means whether a trade dress has --
15   is -- serves as -- well, so a design gets, when we look
16   at a design, we -- we can identify the source that it
17   came from and not the design of the furniture that we're
18   looking at, when we're talking about furniture.
19       Q.   Are you familiar at all with the Ninth
20   Circuit's legal test for determining secondary meaning?
21       A.   At one time I looked it over, yes.
22       Q.   Do you -- go ahead.
23       A.   No, I'm just saying I can't recite it right
24   now, though.
25       Q.   Do you know what factors the Ninth Circuit

Page 135

1    considers when determining whether a secondary meaning
2    exists?
3        A.   The functionality, the -- like the -- those
4    particular factors and the functionality.
5        Q.   So it's your opinion that functionality is one
6    of the factors used to determine secondary meaning;
7    correct?
8        A.   I guess that's not the way I think about it.
9        Q.   Would you explain to me then again, perhaps I
10   misunderstood.
11       A.   Well, it -- you know, just in that simplified
12   way, my -- my whole -- you know, thought about secondary
13   meaning is really that, you know, being able to identify
14   the source.  Being able to -- I talked about in the --
15   maybe the last paragraph or something, a couple of
16   common examples where, you know, the use of John Deere
17   green, yellow or the red soles on Louis Vuitton shoes
18   and we can -- we can look at that and see that's a Louis
19   Vuitton shoe.  Doesn't have to be a specific design or
20   anything, but there's something specific about the trade
21   dress that people associate with the source.  That's --
22   and that's to me what the secondary meaning is -- is.
23       Q.   Right.
24       A.   It looks like.
25       Q.   And do you know what kind of factors are

Page 136

1    considered in determining whether secondary meaning
2    exists for a product?
3        A.   Not the legal factors, no.
4        Q.   Do you know whether they consider consumer
5    surveys?
6        A.   I -- I think again, legally, I think that
7    that's probably correct.
8        Q.   What about direct consumer testimony?
9        A.   I think that can be used as well.
10       Q.   What about exclusivity of use of the trade
11   dress?
12       A.   Assuming that all comes from the same
13   documents, so sure.
14       Q.   Manner of use of the trade dress?
15       A.   It's --
16       Q.   Manner of use of the trade dress?
17       A.   Yeah, I think that's kind of what I was
18   talking about in the last examples I was giving.  So
19   that's my understanding.
20       Q.   What about length of use of the trade dress?
21       A.   I think that that's a factor in most cases,
22   it's kind of an acquired thing, and if you use something
23   long enough it gets associated not just as a design but
24   as the trade dress and as, you know, people
25   understanding that is, you know, identifying where it

# Exhibit 7

**TO THE BADWAY REPLY DECLARATION**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


LIAIGRE INC., A Delaware
Corporation,

                    PLAINTIFF,
                                        Case No.
     -against-                          8:19-cv-01160-AG-KES

CALIFORNIA FURNITURE
COLLECTION, INC. d/b/a ROBERT
JAMES COLLECTION, a California
Corporation; GINA B & COMPANY,
INC., a California
Corporation; and DOES 1-10,

                    DEFENDANTS.




VIDEOCONFERENCE DEPOSITION OF NICOLAS BINCTIN

Taken on Friday, January 29, 2021

By a Certified Court Reporter

At 5:59 a.m.








Reported by:  Alexander J. Nagle, CCR 923

Page 21

```
 1        A.  Yes.
 2        Q.  Is there anything else in addition to
 3   what's listed on page 1 of your report that you
 4   reviewed or relied on to make that opinion?
 5        A.  Also, this, my opinion on French written
 6   law and French case law.
 7        Q.  I don't think I understood what you said.
 8            You based it on French recent law?
 9            THE INTERPRETER:  No.  Written.  Written
10   law and case law.
11            THE WITNESS:  As I indicated at the
12   beginning, it is about publicly available legal
13   information.
14   BY MS. LEIER:
15        Q.  In your opinion, what specific evidence is
16   necessary to show that a work is a collective work?
17        A.  There's a -- the concept of collective
18   work in French law is very restrictive, and you have to
19   show specific information to demonstrate that something
20   would be protected by copyright infringement law.  And
21   because it's very specific, if you cannot prove that,
22   you use the criteria for individual design or
23   collaborative -- collaboration in design.
24            And because French law is focused on the
25   role of individuals to get copyright laws, the
```

Page 22

```
 1   understanding of copyright laws for entities and
 2   companies is very restrictive.
 3            As a result, you need several elements of
 4   proof.  You have to demonstrate the initiative of
 5   creation -- the original initiative of creation.  You
 6   have to assure the direction of the creation.  And you
 7   have to demonstrate creative -- the quality of creative
 8   collaboration.  And you have to demonstrate that all
 9   the individuals working together work within the same
10   initiative and in the same direction.
11        Q.  Anything else?
12        A.  If you can demonstrate specifically each
13   of these points for regard to creation, then you can
14   talk about collective work.  But if you cannot
15   demonstrate all the elements that explain this
16   collective work, you have to go back to either
17   individual creation or transfer of ownership, so to be
18   either individual work or work in collaboration.
19        Q.  So with regard to those elements you just
20   mentioned, what specific types of evidence do you
21   believe are -- is sufficient to meet the requirements?
22        A.  So you have to show initiative, your
23   direction, and also identify the various contributors
24   to the creation for each specific creation.  And it's
25   not possible to qualify in general or collective work,
```

Page 23

```
 1   if you don't have this element.
 2        Q.  Do you believe you need testimony from
 3   each of the employees working on the work to meet the
 4   requirements?
 5        A.  Based on French judicial standards, we
 6   need a written document.  It could be a number of
 7   element, but it could be written instructions.  It
 8   could be minutes of meetings in order to show that the
 9   work that has been done to a purpose.
10        Q.  So you said you need recent documentation.
11   Do you believe you need recent documentation even if a
12   piece of work was created 10 years ago or more?
13            MR. KACHMER:  Objection.  I believe he
14   said "written documents" and not "recent documents."
15            THE WITNESS:  Yeah, written.  Not recent.
16   Written.  In writing.
17   BY MS. LEIER:
18        Q.  I misheard.  Thank you for that
19   clarification.
20            With regard to written documentation, do
21   you believe that oral testimony is sufficient?
22        A.  Based on French legal practice, no.
23        Q.  Is an affidavit sufficient for written
24   documentation?
25        A.  No.  We don't need documents written
```

Page 24

```
 1   posteriorly.  We need documents that were written
 2   during the process of creation that can demonstrate
 3   what was involved in the creation.
 4            These documents would be strengthened by
 5   testimonies, but the testimonies are just confirmation
 6   of the existing written document.  They don't replace
 7   them.
 8        Q.  Is there any specific cases that you're
 9   relying on for your assertion that written
10   documentation is necessary?
11        A.  I use cases that were demonstrated by
12   French courts of law like Mr. Greffe's report, for
13   instance, similar situation where the courts decided
14   that written documents were required.  It's -- the
15   question at issue is the level of evidence and the
16   quality of evidence.
17        Q.  Can you provide me the name and citation
18   to a case that you're relying on?
19        A.  Yes.  Van Cleef.  Maybe you know the
20   drilling company, Van Cleef & Arpels.  The reference is
21   both in my report and in Greffe's report.
22        Q.  Can you spell that case name for the court
23   reporter, please -- Van Cleef.
24        A.  V-a-n C-l-e-e-f.
25        Q.  Any other cases that you believe support
```